## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| KEMETA, LLC, | ) | |
| | ) | Case No. 11-10159 (CSS) |
| Debtor. | ) | |
| | ) | |

### <u>MEMORANDUM OPINION</u>[1]

COZEN O'CONNOR
John T. Carroll, III
1201 N. Market Street
Suite 1400
Wilmington, DE  19801

Counsel to Chapter 7 Trustee
George L. Miller

WOMBLE CARLYLE SANDRIDGE
& RICE LLP
Thomas M. Horan
222 Delaware Avenue, Suite 1501
Wilmington, DE  19801
        -and-
SACKS TIERNEY P.A.
Aaron G. York
4250 N. Drinkwater Blvd, Fourth Floor
Scottsdale, AZ  85251

Counsel for Caliber Partners Fund K, LP

BALLARD SPAHR LLP
Tobey M. Daluz
919 N. Market Street
Suite 1101
Wilmington, DE  19801
        -and-
ROBERTS MLOTKOWSKI SAFRAN
& COLE, PC
Stephen T. Sullivan
7001 E. Paradise Drive
Scottsdale, AZ  85254

Counsel for Invoy Technologies LLC

Date:  May 4, 2012

Sontchi, J. _____

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## INTRODUCTION

1.      The Court conducted an evidentiary hearing on March 26-27, 2012[2] on Invoy Technologies, LLC's Motion to Compel Trustee's Compliance with Section 365(n) of the Bankruptcy Code (Docket 27, hereinafter the "**Motion to Compel**" or the "**Motion**").    In that Motion, Invoy Technologies, LLC ("**Invoy**") seeks an order compelling the Chapter 7 Trustee ("**Trustee**") to comply with the rights to which Invoy claims entitlement under 11 U.S.C. §365(n) ("**Section 365(n)**") by virtue of its Confidential Exclusive License Agreement dated April 7, 2009 (the "**License Agreement**" or the "**Agreement**") with debtor Kemeta, LLC ("**Kemeta**").

2.      The Trustee and Caliber Partners Fund K, LP ("**Caliber**"), the Kemeta's secured lender, have challenged Invoy's entitlement to rights under Section 365(n) based primarily on the contention that the License Agreement was not executory on the Petition Date as the Debtor was in pre-petition breach of the Agreement.[3]

---

[2]   References to the transcripts for these two hearing days are designated herein as "**3/26/12 Trans.**" and "**3/27/12 Trans.**," respectively.

[3] Caliber has taken the laboring oar in this matter with the Trustee's support.  For convenience the Court will refer solely to Caliber in connection with its positions all of which are supported by the Trustee.

## STATEMENT OF FACTS

### A. THE LICENSE AGREEMENT

3.      The License Agreement (Ex. I-001)[4] pertains to certain medical diagnostic technology for measuring chemical species or analytes in breath.  In it, Kemeta (the licensor) granted to Invoy (the licensee) exclusive rights in Kemeta's intellectual property, including patents, trade secrets and the like, within a "Licensed Field of Use," while retaining a field of use for itself.  More specifically, Section 2.1, of the License Agreement, which is the main granting provision, provides as follows:

> 2.1  <u>License Grant.</u>  Subject to the terms, conditions, and limitations set forth in this Agreement, Kemeta hereby grants and agrees to grant in the future to Invoy and its Affiliates, and Invoy hereby accepts, a royalty-bearing, exclusive right, license, and privilege under the ***Licensed Intellectual Property*** in the ***Licensed Field of Use*** throughout the Licensed Territory to make, to have made, to sell, to distribute, to market, to advertise, to offer to sell, distribute or sublicense, to import, to export, to practice, to engage in and/or to use any product, service, apparatus, system, device, component, article of manufacture, composition of matter, method, process, invention and/or any other thing or activity covered by the Licensed Intellectual Property throughout the Licensed Territory for the life of the Licensed Intellectual Property. (emphasis added.)

The "**Licensed Intellectual Property**" is defined in Section 1.11 as, "collectively, the Licensed Patents, Licensed Technology, and Licensed Processes."

4.      The term "**Licensed Patents**" is defined in Section 1.3.

5.       "**Licensed Technology**" is defined in Section 1.4 as:

---

[4]  Exhibits marked by Invoy, which were designated on the actual exhibits as "Invoy-[number]," are cited herein for brevity as "**Ex. I-[number]**."  Caliber exhibits were designated on the actual exhibit as "C-[number]," and will be cited as "**Ex. C-[number]**."

1.4  <u>Licensed Technology</u>.  The term "Licensed Technology" shall mean, ***collectively, all Kemeta technical and design information and know-how relating to detection, measurement and monitoring of breath components (including enabling technologies),*** including: (a) any unpatented proprietary information which Kemeta has or develops which performs or enables the design, manufacture, sale, installation, or operation of Licensed Products and the inventions described in any of the Licensed Patents, such as trade secrets, know-how, drawings, plans, designs, and specifications relating to the apparatuses and the inventions disclosed in any of the Licensed Patents;   (b) any engineering and technical data, knowledge, experience, and proprietary or other information now possessed or hereafter developed by Kemeta that performs or enables the design, manufacture, sale, installation, or operation of the Licensed Products and the inventions described in the Licensed Patents;  and (c) the inventions of the Licensed Patents.  (emphasis added.)

6.      The term "**Licensed Processes**" is defined in Section 1.5:

Section 1.5.  Licensed Processes.  The term "Licensed Processes" shall mean any process covered by any unexpired claim of one or more of the Licensed Patents or pending claims of any patent application which is a Licensed Patent, or arising from Licensed Technology.  Licensed Processes also includes the provision of any service using a Licensed Product.

7.      The "Licensed Technology" and "Licensed Processes" are also referred to herein as the "**Kemeta Technology"** or "**Kemeta's Technology**."

8.      The exclusive license granted to Invoy under Section 2.1 is in the "**Licensed Field of Use**."  This term is somewhat confusingly defined by Section 1.8 ***by what it is not***: "any and all fields of use ***other than the Kemeta Field of Use***." (emphasis added.)  Thus, Kemeta retained certain rights for itself, and granted Invoy exclusive rights in everything else.  The term "**Kemeta Field of Use**" is expressly defined in the Agreement by Section 1.7.  In it Kemeta retains rights in six market areas (subsections (a)-(f)), to commercialize products and processes for "the detection and analysis of

4

*human breath acetone and no other breath analyte*." (emphasis added.) Subsections

(a)-(c) are further limited to various aspects of fat metabolism and diabetes mellitus,

and subsections (d)-(f) are further limited to veterinary markets. Importantly, however,

the field of use in each of the six market areas is expressly limited to "***breath acetone***

***and no other breath analyte***." This acetone-only limitation is expressly reiterated in

major grant provision Sec. 2.1, which states that:

> Nothing herein shall preclude, and it is expressly understood by
> the Parties that ***Invoy has the right to any type of device that***
> ***measures and/or analyzes acetone, provided that it measures***
> ***and/or analyzes one or more analytes in addition to acetone***.
> (emphasis added.)

9.      In exchange for the license grant and other consideration, Invoy agreed to

pay certain license fees, in addition to a running royalty. The fee provision is at License

Agreement Section 3.1, which reads:

> 3.1   License Fee. Once Kemeta has provided the Dow Consents
> according to the terms and conditions of Section 2.6 and 2.7 and
> signed documents needed by Invoy per Section 2.4, including a
> recordable notice of exclusive rights  (collectively, "Conditions for
> Payment"), Invoy agrees to pay and shall pay to Kemeta a license
> fee in the amount of two hundred fifty thousand U.S. dollars
> ($250,000.00):
>
> The first payment of twenty thousand U.S. dollars will be made
> within three (3) days of execution of this Agreement by wire
> transfer to Kemeta and assuming that Kemeta provides the wire
> transfer instructions on April 8, 2009 or April 9, 2009;
>
> The second through sixth payments of twenty thousand U.S.
> dollars ($20,000.00) each will be made on a monthly basis, starting
> on the later of (i) May 15, 2009 or (ii) the 15th of the month following
> Kemeta's fulfillment of the Conditions for Payment; and,
>
> ***The remaining payment of one hundred thirty thousand U.S.***
> ***dollars ($130,000.00) will be made by June 30, 2010, assuming that***
> ***Kemeta has fulfilled the Conditions for Payment and other***

> ***obligations under this Agreement.*** On June 30, 2010, the royalty payment due and discussed in Section 3.2 shall change to four-percent (4.0%). (emphasis added.)

10.    The License Agreement includes a "full integration" clause at Section 12.3, an "anti-waiver" clause at Section 12.4, and a choice of law clause adopting Arizona law at Section 12.5.

11.    The Agreement was signed by Kemeta's founder and then-CEO, Dr. Joan Vrtis ("**Dr. Vrtis**"), as well as by Invoy's President and CEO, Dr. Lubna Ahmad (**"Dr. Ahmad**").

12.    It is undisputed that (i) Kemeta entered into the Agreement; (ii) the Agreement qualifies as a technology license to which Section 365(n) is applicable; (iii) the Trustee rejected the License Agreement; (iv) Invoy requested the Trustee comply with Section 365(n); and (v) the Trustee has not complied with Invoy's request for the reasons currently before the Court.

13.    It is also undisputed that Invoy timely paid the first six installments pursuant to Section 3.1, ¶¶2-3. In addition, it is undisputed that Invoy has not paid the $130,000 fee of Section 3.1, ¶4. The parties disagree, however, as to whether that fee came due on the critical date of June 30, 2010, and the effect of that non-payment.

**B. INVOY AND KEMETA**

**1) Breath Analysis Technology Overview**

14.    Invoy's President and CEO, Dr. Ahmad, testified that the concept of using breath as an indicator of human health has been known since antiquity, when the

ancient Greeks noticed that the smell of a patient's breath coincided with certain health ailments. (3/26/12 Trans. 66:22 to 67:10.)

### a.  Abbott Labs Breath Acetone Technology

15.    In the 1980's, Abbott Labs undertook a project to develop a commercial acetone breath analysis apparatus.  It was known at that time that breath acetone was correlated with fat metabolism, and Abbott attempted to measure acetone as a means to assess fat metabolism.  Abbott substantiated the correlation between breath acetone and fat metabolism, constructed a prototype device for use in a laboratory to measure breath acetone, and obtained FDA clearance for the device.  Abbott did not, however, bring the device to the point of commercial sale. (Ex. I-062; 3/26/12 Trans. 68:4 to 21 and 70:6 to 73:26.)

### b.  The Dow Chemical Company Technology

16.    Efforts to develop a commercial breath analysis device also were undertaken by the Dow Chemical Company (**"Dow"**).  Dow developed an enzyme-based sensor system that comprised immobilizing an enzyme or protein on a solid substrate.  The specific enzyme used was reactive with acetone.  The sensor included electrodes, and functioned as an electrochemical sensor.  Dow also did not commercialize the technology for breath analysis, but licensed this aspect of the technology to Kemeta's predecessor, RoseStreet Labs, LLC.  It is this Dow technology upon which Kemeta's breath analysis technology is based. (Ex. I-072; Ex. I-069; 3/26/12 Trans. 74:1 to 79:11.)

7

2) **Dr. Ahmad and Invoy**

17.    Dr. Ahmad graduated *summa cum laude* as valedictorian from her high school class in 2001 at the age of 16. She received numerous prestigious national scholarships and awards while in college.  She obtained a combined Bachelors and Master of Science degree from Arizona State University ("**ASU")** in biomedical engineering in 2005.  She then proceeded to obtain her Ph.D. in biomedical engineering from ASU, which she obtained in 2008.   (3/26/12 Trans. 54:2 to 55:6; Ahmad 2nd Dep'n.[5] 19:1 to 21.)  Dr. Ahmad's doctoral research work and dissertation pertained to technologies that are directly relevant to breath analysis.   Her principal areas of expertise have been and remain in the areas of biosensor development, with a specific focus in breath analysis, diabetes, and metabolic disorders. (3/26/12 Trans. 55:7 to 58:23.)

18.    Dr. Ahmad began researching and developing in the area of breath analysis technology in about 2001.   She invented certain breath analysis technology during her freshman year at ASU, and was a named inventor on a patent application by age 18. (3/26/12 Trans. 55:7 to 11 and 61:15 to 62:3; 3/27/12 Trans. 116:2 to 8.)

19.    Dr. Ahmad formed Invoy in May of 2006 to continue with her breath analysis research, development and commercialization efforts.   Invoy currently is a developing medical device company with plans to commercialize a breath analyzer for certain health and disease applications.  Invoy has its own technology and intellectual

---

[5] References to the deposition transcript for Dr. Lubna Ahmad conducted pursuant to this bankruptcy proceeding on Feb. 15, 2012 is designated herein as "**Ahmad 2nd Dep'n**."

property, including issued patents, patent applications, and trade secrets.  Invoy has sought and obtained independent funding.  Invoy has an advisory board comprising a number of nationally recognized experts in diabetes and metabolism-related disorders. (3/26/12 Trans. 61:1 to 63:15.)

20.    In June 2011, Invoy achieved its first FDA clearance for a breath analyzer. While full details regarding the analyzer have not been published or released by Invoy as yet, the breath analyzer is designed for use in metabolic monitoring applications, such as diabetes and fat metabolism.  (3/26/12 Trans. 48:12 to 51:12 and 91:13 to 94:20; Ex. I-075; Ex. I-081; Ex. I-204.)

**3)  Dr. Vrtis and Kemeta**

21.    Dr. Joan Vrtis received a chemistry degree from the University of Illinois in 1981, a Master's degree in metallurgy from the Illinois Institute of Technology in 1990, a Masters of Business Administration from DePaul University in 1989, a Master's degree in polymer science and engineering from the University of Massachusetts - Amherst in 1992, and a Ph.D. in polymer science and engineering from the University of Massachusetts in 1994.  (Vrtis 1st Dep'n.[6] 9:3-17; see also 2/1/10 Trans.[7] 32:24-33:5.)  Dr. Vrtis's principal areas of expertise prior to forming Kemeta were in the areas of semiconductor technology.  (Vrtis 1st Dep'n. 9:18 to 14:3.)

---

[6] References to Dr. Joan Vrtis and Kemeta's 30(b)(6) deposition, taken on Jan. 21, 2010 during the Arizona Litigation are designated "**Vrtis 1st Dep'n.**"

[7] References to the Preliminary Injunction Hearing conducted on Feb. 1 and Feb. 2, 2010 in the Arizona Court are designated as "**2/1/10 Trans.**" and "**2/2/10 Trans.**," respectively.

22.     Prior to forming Kemeta in 2007, Dr. Vrtis was a principal in RoseStreet Labs, LLC, which was a semiconductor-related company.   After RoseStreet Labs acquired the Dow technology for breath analysis applications, it was spun out of RoseStreet into the newly-formed Kemeta. (Vrtis 1st Dep'n. 20:6 to 21:25.)

### 4)  Initial Meeting of the Principals

23.     The principals of Invoy and Kemeta, Dr. Ahmed and  Dr. Vrtis, respectively, met for the first time in early 2004, when Dr. Vrtis was conducting due diligence at ASU on breath analysis technology that Dr. Ahmad had invented.   Dr. Ahmad introduced Dr. Vrtis to breath analysis for medical applications, and more specifically, to breath acetone for use in fat metabolism and diabetes, from those discussions.   Those discussions did not, however, result in a final consummated transaction. (3/26/12 Trans. 79:19 to 80:11 and 100:16 to 102:11.)

24.     Dr. Vrtis proceeded to acquire rights in the Dow technology and form Kemeta. (Vrtis 1st Dep'n. 20:6 to 21:25.)

25.     There was a hiatus in communications between Dr. Vrtis and Dr. Ahmad of several years after the time their due diligence discussions ended in the 2004 time frame and before the start of the Invoy-Kemeta merger negotiations.   (3/26/12 Trans. 82:25 to 83:13.)

26.     While their foundational technologies were different, both Invoy and Kemeta sought to develop a product capable of sensing breath acetone for applications involving fat metabolism, as well as broader and more interrelated applications such as diabetes.  Both companies also had different business and market philosophies.  Kemeta

sought to commercialize a product that could measure breath acetone specifically for limited market segments of diabetes and weight management.  Invoy desired to commercialize products that comprised a breath analysis platform capable of measuring multiple analytes, including acetone, for multiple health and disease states, including but not limited to diabetes and weight management. (Ex. I-016; 3/26/12 Trans. 96:4 to 100:4.)

**5) Reinitiation of Communications In May 2008**

27.     In May of 2008, Dr. Vrtis reinitiated dialogue with Dr. Ahmad.  (3/26/12 Trans. 80:1-11.)   In that time period, Dr. Vrtis indicated that she was interested in "transition[ing] out" of Kemeta and selling Kemeta to Invoy.  (Ex. I-007; 3/26/12 Trans. 83:14 to 85:14.)

28.     To facilitate discussion, the parties entered into a non-disclosure agreement ("**Mutual NDA**") dated September 15, 2008.  (Ex. I-008; 3/26/12 Trans. 103:1 to 105:1.)   The parties recognized that they were competitors and the Mutual NDA reflects this:

> "While the Parties hereto are discussing a potential business relationship, they are working in a similar technology space and are presently separate entities.  As such, prior to disclosing highly sensitive Confidential Information, the Disclosing Party shall notify in writing the Receiving Party of the general subject matter to ensure that the Receiving Party is willing to accept it.  The Parties hope that this will minimize superfluous disclosure and keep the communication focused on information that is needed to facilitate discussion of a potential relationship."

**6)  The Merger Discussions**

29.     In September 2008, Invoy and Kemeta began formal discussions regarding a 50:50 merger between the two entities. (3/26/12 Trans. 80:12-17 and 127:1-10.)

30.     During the merger negotiations, the parties engaged in strategic positioning discussions.  They created two documents reflecting their discussions: (a) a roadmap (Ex. I-014), and (b) a document entitled "Overview of Two Breath Analysis Companies" (Ex. I-016).  As reflected in the Overview, they concluded that "Kemeta's acetone sensor was further along the development process, but that Invoy products would likely replace it given the advantages of the Invoy technology…Kemeta products are positioned for short-term revenue whereas Invoy products are positioned for more sustaining, long-term revenue." (Ex. I-016.)

31.     The roadmap and the Overview reflect that both parties had a clear understanding of each other's product goals, relative value, target markets, technical capabilities and business approaches.  (Ex. I-013; Ex. I-014; Ex. I-016; 3/26/12 Trans. 88:10 to 100:4.)

32.     After conducting due diligence, in late January 2009, Invoy terminated merger discussions (Vrtis 1st Dep'n. 87:17-22; 3/26/12 Trans. 80:22 to 82:17.)   Dr. Ahmad cited several reasons for the termination, including the following:  (i) Kemeta's financial liabilities exceeded their assets; (ii) differences in management style; (iii) Kemeta's top-heavy management structure; (iv) its employee compensation obligations; and (v) concerns about Kemeta's royalty obligations and chain of title issues with Dow -

the originator of the intellectual property that underlies Kemeta's Technology. (3/26/12 Trans. 80:22 to 82:17.)

### 7)  **The Negotiations Leading To The License Agreement And Its Execution**

33.    On March 5, 2009, in response to a Feb. 13, 2009 letter request from Dr. Vrtis, Dr. Vrtis and Dr. Ahmad met and returned to each other documents exchanged during the merger discussions. (Ex. I-018; 3/26/12 Trans. 111:2 to 115:10.)

34.    At that meeting, Dr. Vrtis indicated that Kemeta was continuing to have substantial financial problems.  (3/26/12 Trans. 111:2 to 115:10;  Ex. I-018.)  Dr. Vrtis had previously communicated Kemeta's financial distress during the merger discussions on many occasions.  (Ex. I-009; Ex. I-010; Ex. I-012; 3/26/12 Trans. 86:15 to 88:8.)  The principals discussed whether and under what circumstances Invoy could provide capital to Kemeta.  Dr. Ahmad testified that she told Dr. Vrtis that Invoy could not provide debt or equity financing in view of the competitive relationship between the companies.  But the parties left open the possibility of a cash-based transaction. (3/26/12 Trans. 113:23 to 114:20.)  On that same day, Dr. Vrtis confirmed that she would try to identify "a simple way to utilize cash from Invoy." (Ex. I-018.)

35.    On March 17, 2009, Dr. Vrtis transmitted a term sheet for a license agreement.  That term sheet indicated that Invoy would pay $120,000 and a 5% royalty for an exclusive license to Kemeta's intellectual property.  The term sheet contemplated a "field of use" license.  Per the term sheet, Invoy's field of use was for a device that measured acetone using an electrochemical enzyme sensor under Kemeta's intellectual property and at least one other breath biomarker [analyte]. (Ex. I-020.)

13

36.     From that point forward, the parties began negotiating a license agreement.  It is undisputed that the parties were represented by legal counsel.  Kemeta was represented by two attorneys, Tom Myers, a corporate transactional attorney, and Les Miller, a patent litigation attorney, throughout the negotiations.   It is also undisputed that multiple drafts of the license agreement were circulated and the field of use was negotiated many times during the license negotiations. (2/1/10 Trans. 51:23 to 53:3.)

37.     On March 28, 2009, Kemeta's legal counsel advised Dr. Vrtis that the field of use was "broad" and that they had "concerns" with this.   Dr. Vrtis notified Dr. Ahmad of this, but also informed her that Kemeta wanted to minimize legal expenses. (Ex. C-049.)

38.     On or about March 30, 2009, Dr. Vrtis requested that the up-front fee be increased from $120,000 to $250,000.  Dr. Ahmad testified that she was initially reluctant to agree to this as Invoy had concerns regarding Kemeta's chain of title and ability to perform the License Agreement.  As such, the proposed additional $130,000 due date was deferred until September 2010 and, to allay Invoy's concerns, was conditioned on Kemeta full compliance with "all obligations" under the License Agreement.  (Prior to execution, the September 2010 date was changed to June 30, 2010, as is reflected in Section 3.1 of the signed Agreement). (3/26/12 Trans. 128:9 to 130:24; also, compare dollar figures in Ex. I-020 with Ex. I-001.)

39.     On April 6, 2009, Dr. Vrtis sent Dr. Ahmad two drafts of the License Agreement.  The first draft did not include the "no other breath analyte" language.  In

her second email, however, Dr. Vrtis reinserted the "no other breath analyte" language that had appeared in prior versions. (Ex. I-022 versus Ex. C-069; 3/26/12 Trans. 117:19 to 118:9; 3/27/12 Trans. 94:10 to 96:20.)

40.     On April 7, 2009, Dr. Vrtis and Dr. Ahmad exchanged at least two further drafts of the License Agreement. (3/27/12 Trans. 30:9 to 32:21 and 93:14 to 94:7.)

41.     Dr. Vrtis was in Hawaii at the time.  After the last and final version of the Agreement had been agreed upon, and while driving to a Kinkos to fax the executed Agreement to Dr. Ahmad, Dr. Vrtis provided wire transfer instructions to Dr. Ahmad by telephone. (3/26/12 Trans. 162:3 to 165:12.)

42.     On April 7, 2009, Dr. Vrtis and Dr. Ahmad executed the License Agreement at issue in this case. (Ex. I-001.) (3/26/12 Trans. 46:10-25.)

43.     Dr. Vrtis sent the License Agreement, which she had just executed, to Dr. Ahmad via facsimile.  In the comments section of the accompanying fax cover sheet, Dr. Vrtis wrote: ***"Signed License.  As per our conversation we will amend per legal counsel inputs as well as Dow Consent changes that Dow will require.  Joan."*** (emphasis added.) (Ex. C-030).

### 8)  Invoy's Payments And Other Events Following Execution of the License Agreement

44.     The License Agreement was executed by both parties at some point between 9 pm and midnight on April 7, 2009.  Hours after execution of the License Agreement, Invoy wired $20,000 to Kemeta pursuant to Section 3 of the License Agreement. (Vrtis at 2/1/10 Trans. 61:1-5; Ahmad at 3/27/12 Trans. 28:24 to 29:9.)

45.     Dr. Vrtis has testified that she signed the License Agreement because Invoy needed to "show progress" on it in order to procure funds from a prospective investor.  (2/2/10 Trans. 74:7-13.)  The timing of execution compared to the timing of the funds transfer, however, refutes this position.  The fact that Dr. Vrtis provided wire transfer instructions to Dr. Ahmad en route to fax the Agreement at around 9 pm on April 7, 2009 and then accepted the money from Invoy the next morning evidences that Dr. Vrtis knew Invoy had funds on hand and that no such prospective investor existed.

46.     Caliber has not proffered any evidence in the record, other than Dr. Vrtis's testimony, that Invoy "was actually able to get the investor that purportedly needed to see the signed license agreement to actually invest."  (3/26/12 Trans. 22:18-25.)

47.     Even though Dr. Vrtis and Dr. Ahmad had agreed throughout the license negotiations to the "no other breath analyte" scope provision (Ex. I-020; Ex. I-022; Ex. I-001), Kemeta's outside attorneys had objected to it.  The disagreement between Kemeta and its legal counsel is reflected in the March 28, 2009 email (Ex. C-049).  Although the "no other breath analyte" language was briefly removed from one of the multiple drafts of the agreement, *Dr. Vrtis put it back in*.  (Ex. I-022.)

48.     On April 14, 2009, only days after Joan Vrtis had signed the License Agreement with the "no other breath analyte" language included, Kemeta's outside counsel, Tom Myers, sent an email characterizing the signed Agreement as "non-binding" and requested fundamental changes to it.  Mr. Myers acknowledged, however, that the principals had agreed to include the "no other breath analyte"

language.  Mr. Myers also did not propose removing the last sentence of Section 2.1. (Ex. C-054.)

49.    After receiving the email from Mr. Myers, Dr. Ahmad testified that she called Dr. Vrtis to ask why her lawyer had characterized the transaction as non-binding. According to Dr. Ahmad, Dr. Vrtis told her not to worry about it. (3/27/12 Trans. 97:10 to 99:23.)

50.    Indeed, on April 17, 2009, Dr. Vrtis signed a document entitled Confirmatory Exclusive License Agreement, confirming the important field of use provisions, Sections 1.7, 1.8 and 2.1.  The "no other breath analyte" language appears in that document.  Dr. Vrtis had her signature on the document notarized and provided it to Dr. Ahmad.  Invoy then filed the document and recorded it with the U.S. Patent and Trademark Office.  (Ex. I-002.)

51.    It is noteworthy that Dr. Vrtis indicates that she was pressured into signing the License Agreement while in Hawaii.  However, even after transmitting the fax coversheet, returning from vacation, and Mr. Myers expressing his concerns with the field of use and attempting to characterize the License as "non-binding" and a "proposed transaction," Dr. Vrtis reaffirmed the critical field of use provisions and confirmed the License Agreement.  She then proceeded to cooperate with Invoy's recordation that specific language with the U.S. Patent & Trademark Office.

52.    Moreover, Dr. Vrtis proceeded to coordinate with Invoy in obtaining a written consent from **Dow Global Technologies, Inc ("DGTI")**.[8]  In fact, Dr. Vrtis managed the communication with DGTI, which necessitated "verifying" that the signatory was indeed from DGTI. (3/27/12 Trans. 50:15-21.)  The consent from DGTI included the executed License Agreement between Invoy and Kemeta as Appendix A to the document.  The fax coversheet did not appear in Appendix A to the DGTI consent. (Ex. I-027.)

53.    Kemeta continued to correspond regarding its expectation for license fee payments from Invoy, Invoy continued paying those fees, and nothing more was said about the issues raised by Mr. Myers until months later, when it was becoming apparent that litigation was imminent.  (3/26/12 Trans. 160:23 to 161:24.)

**9) Kemeta's Behind The Scene Transaction with SPD**

54.    Stepping back to the signing of the License Agreement, unbeknownst to Invoy (3/27/12 Trans. 82:20 to 83:24;  102:10 to 103:15;  see, also, Bankruptcy Protective Order), one week earlier Dr. Vrtis had signed a 15-page Letter of Intent (Ex. I-096) with a European company named Swiss Precision Diagnostics GmbH ("SPD"), the content of which is in conflict with the Invoy License Agreement.  Principal among the numerous conflicts between the Letter of Intent and the License Agreement is the field of use.  The Letter of Intent does not exclude Invoy's exclusive field of use or any other fields of use, and no mention is made of Invoy or its exclusive License Agreement.  It expressly

---

[8]Kemeta was obligated in Section 2.6 to provide consents of (i) Dow Global Technologies (DGTI) and (ii) The Dow Chemical Company (TDCC).  It is undisputed that Kemeta only provided the DGTI consent; however it is disputed whether the DGTI consent satisfied Kemeta's obligation.

allows "any use" of a breath acetone sensor, and does not limit the sensor to acetone only.

55.    Additionally, on April 7, 2009, hours before executing the License Agreement with Invoy, Dr. Vrtis sent SPD an email stating: "I have not been successful thus far in raising the necessary interim financing to support the primary clinical relevance study.  Our cash flow is at a critical level.  Would SPD consider an upfront investment/loan of $500,000 of which we would deduct this amount from the royalty payments?"  (Ex. I-125.)

56.    This April 7 email confirms Dr. Ahmad's testimony indicating that Dr. Vrtis had reached a critical state that necessitated entering into the License Agreement with Invoy on April 7.  Additionally, it confirms Invoy's position that Dr. Vrtis was not pressured into signing the License while on vacation in Hawaii.  Dr. Vrtis apparently was conducting business with at least two parties while in Hawaii. (Ex. I-125.)

57.    The SPD Letter of Intent required that, before SPD would provide very substantial financial, technical, marketing and other support, Kemeta was required to meet certain prerequisites. (Ex. I-096.)  One of these prerequisites was to undertake certain clinical studies.  Another was for Kemeta to meet certain financial strength criteria and to raise a certain threshold amount of cash.  (Ex. I-096.)  Invoy's License Agreement, and particularly the up-front license fees Invoy was to pay, provided a major part of that funding with optimal timing to help meet those pre-conditions.

58.    Throughout the period from signing of the Invoy License Agreement, throughout the period of dispute evolution prior to filing suit, and throughout the

Arizona Litigation (as defined below), Kemeta continued its efforts to advance that transaction with SPD and obtain the SPD funds.  These efforts included regular, detailed disclosures of Kemeta's Technology, including the same Technology that Kemeta steadfastly refused to produce to Invoy.  (Invoy Exhibits 98-169.)

59.     Even though Dr. Vrtis had signed both the SPD Letter of Intent and the Invoy License Agreement within about one week of each other in early 2009, she did not provide SPD with a copy of the Invoy License Agreement until nearly a year later, when the SPD transaction had become a discovery dispute in the Arizona Litigation, nor is the Invoy License Agreement mentioned anywhere in the SPD Letter of Intent.  (Vrtis 1st Dep'n. 186:4-8;  Ex. I-096; Ex. I-144.)

**10) Events Leading to Dispute – Invoy's Final License Fee Payment and the Demand for Delivery of the Kemeta Technology**

    **a.  Invoy's Demand for the Licensed Technology, and Kemeta's Demands For Return of Its Confidential Information**

60.     In the months following execution of the License Agreement, Invoy made multiple requests to Kemeta for it to transfer the technology to Invoy pursuant to the License Agreement. (Ex. I-034; 3/26/12 Trans. 149:11 to 150:8.)   No substantive affirmative response was provided.

61.     On July 14, 2009, Kemeta sent a letter to Invoy requesting return of certain of Kemeta's confidential information.  The letter mentioned two items that it requested Invoy return, destroy, or control:  (a) the license agreement between Dow Chemical Company and Kemeta predecessor RoseStreet Labs, and (b) a PowerPoint presentation pertaining to an "OTCMG" clinical study. (Ex. C-032.)  Kemeta, however, expressed no

urgency, and Dr. Vrtis mentioned on more than one occasion that the need was not pressing. (3/26/12 Trans. 145:5 to 146:5;  Ex. I-032.)

62.     By September 15, 2009, Invoy had made its final installment license fee payment of $20,000 to Kemeta and, thus, had paid Kemeta the full $120,000 up-front fee. Kemeta, however, still did not transfer the Technology. (3/26/12 Trans. 142:7-14.)

63.     On October 19, 2009, three months after Kemeta's July 14 letter, Invoy responded to the letter justifying its retention of the two documents described in the letter: (a) The license agreement with Dow Chemical Company was critical to establish chain of title, and (b) the PowerPoint presentation fell within the scope of "Licensed Technology" and, thus, Invoy was authorized to have it, and it had been published and was therefore public and not confidential. (Ex. I-032.)

64.     Also on October 19, 2009, Invoy transmitted a letter formally requesting that Kemeta transfer the Technology pursuant to the License Agreement. (Ex. I-034.)

65.     On October 20, 2009, Dr. Vrtis confirmed receipt of Invoy's October 19 letter and indicated that she thought there was a solution to enable transferring the Technology, stating that Kemeta "fully intends to honor the [License] Agreement." (Ex. I-035.)  *Later*, Dr. Vrtis argued that she did not transfer the Technology because she thought there were conditions precedent to the transfer, specifically that Invoy had to pay the full up-front fee (including the conditional $130,000 of Section 3.1, ¶4) and demonstrate completed development of a second analyte besides acetone.  Not only do those conditions not appear in the License Agreement, but they also do not appear in

any communication between Dr. Vrtis and Dr. Ahmad until Kemeta's Verified Answer & Counterclaims filed in the Arizona Litigation.

66.    By November 2, 2009, the disputes between the parties had escalated. Nevertheless, Dr. Vrtis confirmed: "since *we* signed the License, it is binding as currently signed." (emphasis added.)  She maintained her prior position that use of lawyers was expensive and preferred to have an open dialogue between the principals to work out any issues. (Ex. I-038.)

67.    On November 12, 2009, Invoy confirmed to Kemeta that it had destroyed all confidential information belonging to Kemeta with the exception of a video file. Invoy deposited the video file in a safety deposit box at Wells Fargo Bank that it had opened exclusively for the purpose of safeguarding the video. (Ex. I-040.)

### b. Kemeta's Nov. 19, 2009 (First) Termination Letter and New Scope Argument

68.    On November 19, 2009, despite Dr. Vrtis' indication that she hoped to work things out amicably, Kemeta sent a letter to Invoy terminating the License Agreement for trade secret misappropriation based on two grounds:  (a) Invoy was promoting a device that measured acetone on a television broadcast by ABC15, and (b) Invoy's transfer of the video file to the Wells Fargo safety deposit box was insufficient to satisfy Kemeta. (Ex. C-001.)

69.    Dr. Vrtis later testified that she made these allegations against Invoy and Dr. Ahmad without having any evidence that they actually had misappropriated them, *i.e.*, she made them based on a hunch.  At Kemeta's 30(b)(6) deposition in the Arizona Litigation, Dr. Vrtis was unable to identify any specific instances of trade secret

misappropriation. (2/1/10 Trans. 91:9-13 and for context, see 80 to 105.)  Moreover, Dr. Vrtis testified that she had not even seen the video she accused Invoy and Dr. Ahmad of misappropriating prior to formally raising the misappropriation counterclaim in the Answer and Counterclaims in the Arizona Litigation. (2/1/10 Trans. 82:5-13.)

70.     Kemeta also took the position in its Nov. 19, 2009 letter that Invoy was barred from building a breath acetone sensor, regardless of the underlying technology that was used: "Invoy has no license to compete with Kemeta in the measurement of breath acetone for weight management, weight reduction, fat metabolism, fat loss management or diabetes mellitus" regardless of whether another analyte was being measured.  (Ex. C-001.)  Although Caliber is not making that argument today, Kemeta's position on November 19, 2009 was that the License Agreement prohibited Invoy from any form of competition in breath acetone measurement, regardless of whether it was with Invoy's technology or Kemeta's Technology.

71.     On November 20, 2009, after receiving the termination letter, Invoy served the Complaint it had filed on November 10th in what became known as the Arizona Litigation. (3/26/12 Trans. 144:8-14; Ex. I-005).

### c.  Invoy's Objections, And Its Return or Destruction of Kemeta's Allegedly Confidential Materials

72.     On November 23, 2009, Invoy removed the video file from the safety deposit box and had it sent via courier to Kemeta's office. (Ex. I-041.)

73.     November 29, 2009, Invoy responded to Kemeta's Nov. 19, 2009 termination letter.  In its response, Invoy (i) provided a formal certification from Dr. Ahmad confirming what Invoy had said on November 12, 2009, (ii) confirmed that

Invoy had destroyed all Kemeta confidential information, and (iii) notified Kemeta that Invoy had modified its website to remove the sentences that Kemeta had identified as being offensive.  Invoy's actions were within the 30 day period for cure afforded by the License Agreement. (Ex. I-043.)

**11) The Arizona Litigation**

### a.  <u>The Pleadings</u>

74.    On November 10, 2009, Invoy filed a lawsuit in the Superior Court of Maricopa County, Arizona.  Invoy alleged five counts, all directed to breach of contract and contract-related declaratory relief. (Ex. I-005; 3/26/12 Trans. 167:11 to 168:6; see 2/1/10 Trans. generally.)

75.    On December 23, 2009, Kemeta filed its Verified Answer & Counterclaims, alleging 11 counterclaims against Invoy and against Dr. Ahmad personally as a third party defendant.  They included multiple fraud claims, claims for misappropriation of Kemeta's alleged trade secrets, and claims that Invoy had made false and misleading statements regarding its ownership of patents. (Ex. I-005; 3/26/12 Trans. 167:11 to 168:6; see 2/1/10 Trans. generally.)

### b.  <u>The Preliminary Injunction Proceeding</u>

76.    On December 24, 2009, Invoy filed a Motion for Preliminary Injunction seeking two grounds of injunctive relief.  One was for delivery of a subset of the Kemeta Technology, and the other was to enjoin any transactions with SPD or any other third party that conflicted with Invoy's exclusive license rights. (Ex. I-005; 3/26/12 Trans. 170:10-22; see 2/1/10 Trans. generally.)

77.     On January 5, 2010, Kemeta filed an Opposition to Invoy's Motion for Preliminary Injunction and Cross Motion for Preliminary Injunction with seven grounds for injunctive relief.  (Ex. I-005; Ex. I-047; 3/26/12 Trans. 170:23 to 171:21).

78.     On February 1 and 2, 2010, the Arizona Court conducted a 2-day evidentiary hearing on the preliminary injunction applications (the "PI Hearing"). (Ex. I-005; see 2/1/10 Trans. and 2/2/10 Trans. generally.)

79.     At the conclusion of the testimony, on February 2, 2010, the Arizona Court found a likelihood of success on the merits in Invoy's favor.  The Court's statement included:

> COURT:  From review and interpreting the license agreement, *I believe that the likelihood of success rests on Invoy's side*.  (2/2/10 Trans. 154: 6-8.)(emphasis added)

> COURT:  ….I have told you [Kemeta] based on what I've seen and what I understand in this contract that you guys are in a hole and you have a huge uphill battle to dig out of it, but *-- because I interpret this contract the way that Plaintiffs Invoy have suggested*.  (2/2/10 Trans. 160: 3-7.)(emphasis added)

80.     On February 2, 2010, Invoy moved to consolidate the PI Hearing with the trial on the merits.  Kemeta, however, argued that it had preserved its right to a trial by jury.  As such, the Court created an accelerated schedule for the parties to complete discovery by April 15, 2010 and get to trial by June 2010.  (3/26/12 Trans. 175:2-17.)

**c.   Discovery and Related Disputes Following the PI Hearing**

81.     Between February 2 and March 4, 2010, the Court conducted four discovery-related hearings.  On March 4, the Court did two things: (a) it interpreted the

technology transfer provisions that were at issue in the case, and (b) it made several discovery orders. (Ex. I-053; I-054; I-004,)

82.    On the technology transfer provisions, the Court found that Kemeta had an obligation to transfer[9] its Technology to Invoy.

> THE COURT: Wait a minute. I think we talked about I didn't see that as a condition precedent for Kemeta to produce the data that's warranted under this license agreement. Under the license agreement, they [Invoy] bought it. It didn't say and you get it as soon as we show you that we have a process that uses another analyte. (3/4/10 Trans. 56: 5-10).

> THE COURT: I'm telling you [Kemeta] you sold it [the trade secrets and know-how] to them [Invoy]. (3/4/10 Trans. 56: 16-18.)

83.    On the discovery disputes, the Court ordered Invoy to produce certain documents pertaining to its development of a "second analyte" that fell under the scope of the License Agreement.  It ordered Kemeta to produce communication regarding SPD and to produce all documents related to "Licensed Technology" and "Licensed Processes" under the License Agreement. (Ex. I-054.)

84.    On April 9, 2010, the judge that presided over the PI Hearing was rotated to the criminal court and the case was reassigned to a new judge.  On April 16, 2010, the new judge conducted a hearing.  As the parties still had discovery disputes, the Court ordered that motions to compel be filed by April 30, 2012 for his consideration. (3/26/12 Trans. 177:16 to 179:9.)

---

[9] For the sake of clarity, the term "transfer" is used throughout to mean "give access" not necessarily "grant title."

85.     On April 30, 2010, Kemeta's recently-appointed CEO, Tom Larkin, contacted Invoy's investors in Florida, despite the specific instruction from counsel for the investors to Kemeta's counsel that all communication be directed through him.  Mr. Larkin proceeded to allege to Invoy's investors that Dr. Ahmad had made material misrepresentations to them, and he suggested that they pull their funding from Invoy. (3/26/12 Trans. 179:2 to 180:6.)

86.     On May 2, 2010, Invoy filed an Emergency Motion for Protective Order seeking to prevent Kemeta from contacting Invoy's investors.  The Court granted this motion. (3/26/12 Trans. 179:2 to 180:6.)

### d.  The Discovery Disputes and the Motions to Compel

87.     On April 30, 2010, Invoy filed six motions to compel.  These included a motion to compel Kemeta's production of its Technology, a motion to compel identification of the trade secrets it alleged Invoy and Dr. Ahmad had misappropriated, and others. (3/26/12 Trans. 180:7 to 182:24; Ex. I-059.)

88.     Based on the SPD Letter of Intent, Invoy also filed a motion to amend the pleadings to add a fraud count against Kemeta and Dr. Vrtis. (3/26/12 Trans. 178:6-23.)

89.     Kemeta also filed six motions to compel. (3/26/12 Trans. 180:7 to 182:24; Ex. I-059.)

### e.  Kemeta's June 19, 2010 Termination Letter and Invoy's Summary Judgment Motion re: the $130,000 Fee

90.     On July 19, 2010, Kemeta sent Invoy a second termination letter noticing termination of the License Agreement based on Invoy's failure to make the $130,000 payment on June 30, 2010. (Ex. C-002.)

91.     On August 19, 2010, Invoy filed a motion with the Arizona Court seeking summary judgment that the $130,000 was not due or, alternatively, that the court should hold the issue in abeyance pending the final outcome in the case.  Invoy also offered, if the Court deemed it appropriate, to deposit the $130,000 in the Court's registry. (3/26/12 Trans. 184:15-185:22; Ex. I-056; Ex. I-058.)

### f.   The Arizona Court's Ruling on the Motions to Compel

92.     On September 14, 2010, the Arizona court heard the various motions to compel that had been filed pursuant to the court's April 30 deadline.  Invoy's motions to compel and the motion to amend the pleadings were granted, with limited exceptions.  Kemeta's motions, with minor exceptions, were denied.  Notably, Kemeta was compelled to produce its Technology, submit to a premises inspection, submit to electronic discovery of its computers, and not object to third party discovery of its suppliers and clinical partners.  Kemeta was also ordered to produce documents related to SPD.  (3/26/12 Trans. 186:2-187:10; Ex. I-059.)

93.     Following that Sept. 14 hearing, Kemeta filed a motion for reconsideration.  That motion was denied by the court.  (3/26/12 Trans. 187:11-188:19.)

94.     Kemeta then filed several new motions. (3/26/12 Trans. 187:11-188:19.)

### g.   The Arizona Court's Rulings on Kemeta's Litany of Motions and the Court's Final Order to Comply With Discovery

95.     On December 14, 2010, the Court heard and denied Kemeta's motions.  The Court ordered that Kemeta fully comply with its September 14 order, and set a deadline of no later than January 15, 2011. (3/26/12 Trans. 188:11-24.)

96.     On January 10, 2011, the parties appeared in court to argue Invoy's motion for summary judgment on the License Fee.  At the outset of this hearing, counsel for Kemeta moved to withdraw.  The court granted Kemeta's motion.  It did not, however, move the January 15, 2010, discovery response deadline, and specifically instructed Kemeta to abide by it. (3/26/12 Trans. 189:2-190:4.)

97.     In view of the withdrawal of Kemeta's counsel, Invoy granted Kemeta a few extra days, until January 18, 2011, to comply with the court's order. (3/26/12 Trans. 190:5-14).

98.     On January 19, 2011, Kemeta did not produce the documents ordered by the Arizona court, but instead filed its petition for Chapter 7 bankruptcy. (3/26/12 Trans. 190:5-14) .

### 12) The Looting of the Kemeta Bankruptcy Estate
#### a.  <u>The Looting</u>

99.     During the first weekend following the Petition Date, Dr. Vrtis, with the help of at least one other Kemeta employee, entered the Kemeta facility in Mesa, Arizona, removed multiple car and truck loads of materials, and transported them to Dr. Vrtis's residence. (Ex. I-171.)

100.    This looting and related events were witnessed and photographed by private investigators Johnny Vasquez and Andrea Murphy, who had been retained by Invoy to monitor whether or not Kemeta had indeed ceased operations in view of their chapter 7 filing. (Ex. I-171; 3/26/12 Trans. 191:1-18.)

101.    During the course of this looting, the private investigators witnessed Dr. Vrtis transport some of the items she had taken from the Kemeta office and dispose of them in a dumpster.    The investigators retrieved some of the discarded materials, including three-ring binders containing hundreds of pages of technical information including original prototype devices, contact information, etc., which were never produced at in the Arizona Litigation. (Ex. I-171, 176.)

102.    Invoy brought this looting to the attention of the Trustee as early as the week of January 24, 2011. (Ex. I-197.)

### b.    The Materials Looted, Which Included Kemeta's Licensed Technology

103.    According to the testimony and photographic support of Mr. Vasquez, Dr. Vrtis and her assistant were at the Kemeta facility for many hours, and they removed multiple car and truck loads of items. (Ex. I-171.)

104.    The materials retrieved from the dumpster were inspected by Dr. Ahmad, who provided a detailed analysis of them in her testimony at the hearing.    She demonstrated that they comprised Kemeta Technology and that the information contained in them was key technological information pertaining to critical technical and design issues with the Kemeta breath analysis technology.   (3/26/12 Trans. 191:19 to 201:11.)

105.    Portions of the documents include technical materials on Kemeta's hydration technology and related hydration issues and challenges for its enzyme-based sensors.  Dr. Vrtis, testifying about Kemeta's alleged trade secrets and not in the context of the notebooks, acknowledged in her recent deposition that the hydration system to

which a substantial portion of the notebook materials were devoted, were among the key trade secrets Kemeta held. (3/26/12 Trans. 191:19 to 201:11.)

106.    The discarded materials also included physical prototypes of breath analysis components, such as electrodes upon which enzyme materials had been deposited.  Various original documents on graph paper and documents with original handwritten notes and interlineations were included. (3/26/12 Trans. 197:5-11.)

###    c.  The Denial of the Looting and Misrepresentation

107.    Dr. Vrtis does not deny that Mr. Vasquez's report is accurate, or that the materials he avers were removed from the Kemeta facilities were not removed.  There is no evidence refuting his testimony. (Vrtis 2nd Dep'n. 167-202.)

108.    Approximately two weeks later, at the 341 meeting on Feb. 11, 2011, Kemeta's CEO Mr. Thomas Larkin acknowledged under oath that items were removed, but testified that only "personal" items were removed, whereupon he produced a list of removed items.  (Ex. I-177; 3/27/12 Trans. 118:20-121:24.)

109.    Mr. Larkin's testimony during the 341 meeting is inconsistent with the photographic evidence, the declarations of the private investigators, and the items salvaged from the dumpster.

110.    Invoy 177 is a document entitled "List of Personal Items Removed."  Dr. Vrtis confirmed that she prepared this document and provided it to Mr. Larkin and Kemeta bankruptcy counsel, Mr. Kevin Mann.  Although she denies knowing that it was used for the 341 meeting, she confirms that it is a list of personal items that she removed from the Kemeta office post-petition.  (Vrtis 2nd Dep'n, 193:9 to 195:17.)

111.    When confronted with the notebooks retrieved from the dumpster during her recent deposition, Dr. Vrtis testified that the material in the notebooks was outdated, and that it was duplicative of what was on the server in Kemeta's offices. (Vrtis 2d Depn, pgs. 167-202).

112.    Neither Vrtis, Caliber, the Trustee nor anyone else has offered any evidence, other than Dr. Vrtis's unsupported statements, that in fact the material in the notebooks was outdated, or that newer materials were resident in the Kemeta's office.

## LEGAL DISCUSSION

### A.  THE LICENSE AGREEMENT WAS AN EXECUTORY CONTRACT AS OF THE PETITION DATE AND, THUS, SECTION 365(n) IS APPLICABLE

113.    Caliber argues that the License Agreement was not an executory contract as of the Petition Date and, thus, section 365(n) is inapplicable. More specifically, Caliber argues that the contract is not executory because: (i) Invoy was under no obligation to perform on the Petition Date due to the *Debtor's* previous material breach of the contract; (ii) Invoy cannot now render the contract executory by reviving its own performance obligations, i.e., it is too late as a matter of fact and law to render the contract executory; and (iii) Invoy has not shown that the Debtor was engaged in a fraud scheme with SPD so as to justify a departure from the established rule that contract must have performance due on *both* sides as of the Petition Date in order to be executory.

### 1) Kemeta's Pre-Petition Breach Of The License Agreement, Which Discharged Invoy's Obligation To Perform, Did Not Render The License Agreement Non-Executory

114.    The Court will first consider the argument that the Debtor's pre-petition breach rendered the License Agreement non-executory.  A finding that the contract was and is executory, would render the latter two arguments moot.

115.    Caliber argues that the License Agreement was not executory on the Petition Date because Kemeta had materially breached the Agreement pre-petition.

116.    Section 365 of the Bankruptcy Code does not define the term "executory contract."  However, the majority of published decisions cite with approval the so-called Countryman definition, which has been expressed as follows: "A contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other."   Countryman, *Executory Contracts in Bankruptcy*, 57 Minn. L. Rev. 439, 446 (1973); see also *Sharon Steel Corp. v. National Fuel Distribution Corp.,* 872 F.2d 36, 39 (3d Cir. 1989); and *In re: Broadstripe, LLC*, 402 B.R. 646, 655 (Bankr. D. Del. 2009).

117.    It is undisputed that Kemeta's pre-petition breach discharged Invoy's obligation to continue to perform under Arizona law.  *See The Frank Lloyd Wright Foundation v. Kroeter,* 697 F.Supp. 2d 1118, 1133 (D. Ariz. 2010) ("Under Arizona law, 'the victim of a material or total breach is excused from further performance' under the contract[.]"), *quoting Zancanaro v. Cross*, 339 P.2d 746, 750 (Ariz. 1959).  Caliber contends that because Kemeta was in material breach of the License Agreement on the Petition Date, under Arizona law, Invoy was discharged from any duty to perform its obligations under the Agreement, at least until Kemeta's breach was cured.  According

33

to Caliber, by virtue of this discharge, even if temporary, the License Agreement was non-executory.  In the event Kemeta's breach were cured, the obligations may become renewed, at which point the Agreement would regain its executory status, but such cure had not been made as of the Petition Date.  Caliber therefore argues that the Agreement was non-executory on the Petition Date on this basis, and that it does not qualify for entitlement under Section 365(n).

118.    In support of its argument, Caliber cites to the Seventh Circuit's holding in *Matter of C & S Grain Co., Inc.*, 47 F.3d 233, 237 (7th Cir. 1995).  C & S Grain was formed for purposes of buying, selling, and storing grain.  Prior to filing bankruptcy, C & S Grain was forced by its financial difficulties to surrender its grain licenses to the Illinois Department of Agriculture.  Shortly thereafter, C&S Grain filed bankruptcy.  C&S Grain (now the debtor) was a party to a number of contracts that required the counter-party to the contract to sell grain to the debtor at a set price on a set date.  The market price of grain exceeded the contract price and, as a result, it became profitable for the debtor to enforce the contract.  Because C&S Grain was in bankruptcy, it sought to assign the right to buy the grain to a third party.

119.    The Seventh Circuit held that, under Illinois law, "by surrendering its licenses to the [Illinois Department of Agriculture], C & S Grain declared itself unable to perform and effectively repudiated its contractual obligations." *C&S Grain*, 47 F.3d at 237.  The Court went on to hold, again under Illinois law, "in the face of clear evidence of an intent to repudiate, the non-repudiating party is no longer under an obligation to perform.  Because one party is not obligated to perform, the contract is no longer

executory as defined in bankruptcy." *Id.*  As the parties with whom C & S Grain had contracted were relieved of their duties to perform under Illinois law when C & S Grain relinquished its licenses the contracts were longer executory and could no longer be assumed by the debtor.

120.    In making its ruling, the Seventh Circuit relied upon and adopted the ruling from *In re Murtishi,* 55 B.R. 564, 567 (N.D.Ill.1985).  In *Murtishi*, the court started by summarizing the Seventh Circuit's holding in *Matter of Chicago, Rock Island & Pac. R. Co.*, 604 F.2d 1002 (7th Cir.1979), to be that "a contract fully performed by the non-debtor party is not deemed executory by reason of the fact that the debtor has not performed and, therefore, may not be rejected by the trustee." *Murtishi*, 55 B.R. at 567. Extrapolating from the "reasoning" in *Rock Island* and without supporting citation, the *Murtishi* court went "a step further,"  holding that "when the debtor has not only failed to perform but has breached the contract pre-petition with the result that the other party has no further duty to perform but rather holds a claim against the debtor, the contract is no longer executory for purposes of section 365."

121.    *C&S Grain* and *Murtishi* support Caliber's position that Kemeta's breach of the Agreement renders the contract non-executory.  But other courts have disagreed with their holdings.

122.    Among them is the court in *In re W&L Associates, Inc.*, 71 B.R. 962 (Bankr. E.D. Pa 1987).  The debtor in that case owned a parcel of real estate in Philadelphia. That parcel served as the parking lot for an adjoining restaurant.  Prior to the bankruptcy, the owner of the property entered into a contract to sell the parcel for

approximately $250,000.  Apparently suffering from seller's remorse, the seller/future debtor did not appear at the sale closing.  The buyer tendered a check for $270,000 to the settlement agent and brought an action for specific performance in Pennsylvania state court.  Shortly thereafter and before the state court could rule, the seller filed bankruptcy.  The seller/debtor filed a motion to reject the sale contract.  The buyer opposed the motion, arguing, in part, that the sale contract could not be rejected because it was not executory.

123.    The *W&L Associates* court started its analysis by acknowledging that many courts have defined "executory contracts" by reference to the Countryman definition, i.e., "A contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." Countryman, *Executory Contracts in Bankruptcy*, 57 Minn. L. Rev. 439, 446 (1973).  The court noted, however, that "Countryman, in formulating his seminal definition, posits that contracts fully performed by the non-debtor party should not be subject to rejection only because of his observation that, in such a situation, '[t]he estate has whatever benefit it can obtain from the other party's performance and the trustee's rejection would neither add to nor detract from the creditor's claim or the estate's liability.'" *W&L Associates*, 71 B.R. at 965 (quoting 57 MINN.L.REV. at 451).  Thus, the court concluded that "it is apparent that Countryman meant to exempt from the scope of executory contracts only that group of contracts pursuant to which the Debtor has already received the full benefit of the contract from the non-debtor contracting party prior to the bankruptcy filing." *Id.*

36

124.   In so ruling, the *W&L Associates* court expressly rejected the holding in *Murtishi*, noting that "[m]ost debtors have breached at least some executory contracts pre-petition, and section 365(b) expressly provides [those debtors] with an opportunity to cure or provide adequate protection to the obligee and retain their contractual rights."[10]  Finally, the court found unpersuasive the *Murtishi* court's attempt to avoid the "absurd result" that *all* executory contracts the debtor has breached pre-petition are not executory and, thus, cannot be assumed, assigned nor rejected by limiting its holding to where the breach is material and "debtor obligee 'has no further duty to perform.'" *Id.* (quoting *Murtishi*, 55 B.R. at 567).  Rather, it held that the *Murtishi* court was merely "reciting the clearly-recognized principle that a bankruptcy filing cannot revive a contract that was already terminated pre-petition."

125.   Caliber attempts to make the same distinction, arguing that a debtor can cure "defaults" under section 365(b) but only a *material* breach by the debtor that excused the counterparty's performance would render a contract non-executory.  The distinction between a default under section 365 and a material breach, which Caliber argues would be subset of default, is meaningless under the law for a number of reasons.

126.   First, under contract law, the "exception" of a material breach from a non-material breach is inapplicable in bankruptcy.  Contract law provides that a material breach by one party's obligations excuses the other party's duty of performance and enables the non-defaulting party to terminate the contract.  The cases interpreting the

---

[10] *W&L Associates* does not cite to *C&S Grain* as that case was decided several years later.

materiality requirement, however, focus almost entirely on whether the breaching party has been given sufficient time to cure the default.  If so the breach is material and if not it is immaterial.  Section 365, however, assumes the debtor has defaulted and then provides the debtor with a statutory right to cure the default with no limitation related to the passage of time.

127.    Compare the two situations under the statute.  In the first, the debtor defaults under the contract but the breach is immaterial.  Under section 365, the debtor can assume, assign or reject the contract, provided it cures the non-material breach. Second, the debtor materially breaches the contract.  Again, under section 365, the debtor can assume, assign or reject the contract provided it cures the non-material breach.  There is no difference based upon the materiality of the breach.

128.    Second, notwithstanding the unqualified language of section 365(b)(1)(A) of the Code, cure is not required for a minor, nonmaterial default. See *In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1092, 21 Bankr. Ct. Dec. (CRR) 361, 24 Collier Bankr. Cas. 2d (MB) 581, Bankr. L. Rep. (CCH) P 73769, 117 A.L.R. Fed. 725 (3d Cir. 1990); *In re Windmill Farms, Inc.*, 841 F.2d 1467, 1473 (9th Cir. 1988); *In re Vitanza*, 1998 WL 808629, at *25 (Bankr. E.D. Pa. 1998); *In re Sweeney*, 215 B.R. 97, 103 (Bankr. E.D. Pa. 1997); *In re Whitsett*, 163 B.R. 752, 754 (Bankr. E.D. Pa. 1994).  Thus, the only contracts requiring the debtor to cure the default are those where it has made a material breach.  Under Caliber's reasoning, however, it is those contracts, i.e., those with material breaches, that cannot be assumed, assigned or rejected because the pre-petition breach makes the contract non-executory.

129.    In short, Caliber's reasoning leads to the absurd result that the debtor cannot assume, assign or reject *any* contract that it has breached pre-petition.  Clearly, this cannot be the law.

130.    Applying the holding in *W&L Associates* to the facts of this case it is clear the License Agreement is executory.  The Debtor did not receive the full benefit of the License Agreement from Invoy prior to the bankruptcy filing.  For example, as *repeatedly noted by Caliber*, Invoy has yet to make the $130,000 payment that Caliber claims was due to Kemeta pre-petition.  In addition, Invoy has never acknowledged nor agreed that the License Agreement was terminated.  Indeed, it has vigorously advocated just the opposite.  ***Thus, this Court finds the License Agreement was executory on the Petition Date***.

### 2)  The License Agreement Is Otherwise Executory

131.    Having disposed of Caliber's breach theory, the License Agreement was otherwise executory on the Petition Date.

132.    As of the Petition Date, Invoy's continuing obligations under the License Agreement included, for example, an obligation to pay royalties (Sec. 3), a responsibility for accounting (Sec. 3.6), attainment of certain performance milestones to retain exclusive rights (Sec. 4), obligations to undertake patent marking on its Products (Sec. 5), obligations to take responsibility of certain acts of Invoy's affiliates (Sec. 9.4), and others.  Invoy did not seek a remedy of termination, even in litigation that ensued between the parties pre-petition, instead seeking specific performance and damages.

133.    Similarly, as of the Petition Date, Kemeta had remaining obligations under the License Agreement , which included, for example, a duty to honor Invoy's exclusive rights granted under the Agreement and refrain from interfering with those rights (Secs. 2.1 and 6.5), a duty to provide Invoy with Kemeta's Licensed Technology, Licensed Processes and Improvements, upon entering the Agreement and throughout its term (Secs. 1.3, 1.4 and 2.1), a duty to execute documents in aid of Invoy's rights (Sec. 2.4), a duty to obtain third party consents (Sec. 2.6), a duty of indemnification (Sec. 6.9), a duty to prosecute patent applications and maintain patent assets (Sec. 10.1), a duty to notify Invoy of infringements (Sec. 10.2), a duty to cooperate in patent validity and enforcement actions (Sec. 10.4), and so on.

134.    As of the Petition Date, the Debtor and Invoy both had obligations under the License Agreement that rendered the License Agreement executory on the Petition Date.  Having made that finding, the Court need not address Caliber's remaining arguments on this point .

**B.  THE TERMS AND SCOPE OF THE LICENSE AGREEMENT**

135.    Having found the License Agreement to be executory, the Court must determine the relevant terms of the contract to which section 365(n) will then be applied.  This is a mixed question of law and fact.

**1)  The Terms and Scope Of The License Agreement**

136.    The applicable terms of the License Agreement are set forth in ¶¶ 3-10, *supra*.  The dispute over interpretation centers on the "Licensed Field of Use," which, in turn, is defined in reference to "Kemeta's Field of Use."  More specifically, the parties

dispute whether Kemeta's retained scope of use is limited to devices and methods that comprise "breath acetone and no other breath analyte."

137.    Invoy argues that there is a three-step test for determining if a product falls within Kemeta's Field of Use: (i) does the product utilize valid and enforceable intellectual property of Kemeta; (ii) does the product involve breath acetone and no other breath analyte; and (iii) is the product useful for the applications listed in Section 1.7 (e.g., "weight management, weight reduction, fat metabolism, and fat loss management, and for the management, detection and monitoring of diabetes mellitus and for the care of persons with pre-diabetes mellitus or diabetes mellitus"). ***If and only if the product meets all three elements***, it is within Kemeta's Field of Use. Everything outside of Kemeta's Field of Use falls within Invoy's Field of Use under Section 1.8 of the Agreement.  Invoy argues that its position is supported by the plain meaning of the Agreement as well as the parol evidence surrounding its execution.

### 2)  Caliber's Interpretation of the License's Scope

138.    Caliber does not seriously argue over the plain meaning of the Agreement.    Rather it argues that, notwithstanding the above, Invoy's scope of use should be much narrower. Caliber contends that the "no other breath analyte" language should be stricken or disregarded as "meaningless" from Sections 1.7(a) through (f). Caliber further contends that the last sentence of Section 2.1 should be stricken or disregarded in its entirety.   In so doing, Caliber argues that Invoy should not be permitted to utilize Kemeta's Technology for diabetes, fat metabolism or weight management, regardless of the number of analytes that the device measures.

139.    Caliber offers support for its position on two grounds: (1) Dr. Vrtis knew of no other breath analyte, other than acetone, that was "meaningful" for diabetes or fat metabolism, and allowed the inclusion of the "no other breath analyte" language because she thought it was meaningless and therefore harmless; and (2) Dr. Vrtis would not have allowed Invoy to compete in the areas of diabetes, fat metabolism and weight management, at least not with Kemeta's Technology.

### 3)    Negotiation of the License Agreement

140.    Invoy and Kemeta, and their principals, Dr. Ahmad and Dr. Vrtis, are sophisticated business professionals.  Dr. Vrtis, in particular, has had a business and technology career spanning 25 years of professional activity.

141.    It was Dr. Vrtis, not Dr. Ahmad, that originally proposed the scope that is set forth in the License Agreement.  On March 17, 2009, in the original term sheet that Dr. Vrtis sent to Dr. Ahmad proposing the license agreement, Dr. Vrtis stated that Invoy's field of use was for a "a device that measured acetone using an electrochemical enzyme sensor and at least one other breath biomarker [analyte]."  It mentions nothing about diabetes or fat metabolism restrictions.  This sentence closely parallels the language set forth in the last sentence of Section 2.1 of the License Agreement.  (Invoy Ex. 20).

142.    Dr. Vrtis also was the last person to add to or modify Section 1.7 of the License Agreement.  On April 6, 2009, she added back the "no other breath analyte" language.  (Invoy Ex. 22).

143.    It is undisputed by Caliber that the scope of the License was negotiated at length.

> Q.    And multiple drafts included discussions of this Field of Use, these sections we just read, 1.7, 1.8?
>
> A.    Yes, we went back and forth multiple times.
>
> (2/1/10 Trans., Day 1: 53:1-3).

144.    It is also undisputed that the "no other breath analyte" language was added at the mutual agreement of the parties.

> Q.    Did you and Dr. Ahmad discuss this language ["no other breath analyte"] prior to the time you signed the license agreement?
>
> A.    Yes.
>
> Q.    And what did you and Dr. Ahmad discuss?
>
> A.    That no other breath analyte, I thought it was redundant, she felt it needed to be in there, so we left it in to support Invoy.
>
> (2/2/10 Trans. Day 2 70:7-13).

145.    Although Dr. Vrtis maintained that she wanted to amend the License Agreement, she agrees that it was binding as signed: "since we signed the License, it is binding as currently signed."  (Invoy 038).  She further admitted that amendments to the License Agreement would require mutual consent:

> Q.    Is that why you put, quote-unquote, that amendments require mutual agreement?
>
> A.    They all do. I can't force it on Lubna to sign and they can't force it on me, so..."
>
> (2/1/10 Trans. 68:12-13).

146.    It is also undisputed that both parties were represented by legal counsel during the licensing negotiations.

147.    Prior to signing the License Agreement, on March 28, 2009, counsel for Kemeta advised Dr. Vrtis that the scope of the License Agreement was broad.  Dr. Vrtis, however, did not include the recommended language from her legal counsel. Moreover, notwithstanding this advice, on April 7, 2009, Dr. Vrtis signed the License Agreement with the broader scope language included.  She then reaffirmed that scope in a separately prepared document on April 17, 2009.

### 4) Dr. Vrtis Knew That Invoy Would Be Competing With Kemeta

148.    The roadmap created by the parties indicates or suggests that Invoy would be building an acetone and ammonia device.  Dr. Vrtis' patent application (Invoy 074) indicates that an acetone and ammonia sensor would provide a "more complete health picture" than acetone alone.  Clearly a device with greater user benefit is likely to provide increased competitive advantage, and possibly offer access to markets that might not be available to an acetone-only design.

149.    Dr. Vrtis plainly admitted in the Arizona Litigation that, via the License Agreement, Invoy was free to use Kemeta's Technology to compete in renal disease and lung disease.

> THE COURT:        So if there's no other breath analyte for this type of thing, what did you think they were getting?  What do you think Invoy was buying?
>
> THE WITNESS:        Well, they're buying -- they were buying the acetone sensor… In disease state, when you go into like lung

disease, renal failure, et cetera, the metabolic states could change in
the body and so acetone could fluctuate.

(2/2/10 Trans., 79:22 to 80:13).

150.    Dr. Vrtis's testimony, however, does not make practical sense.
Approximately 50% of the diabetic patients are at risk for renal disease and the majority
of patients with renal disease have diabetes.   (Bailey Report Invoy Ex. 075 and Invoy
206).

151.    Considering the close relationship or overlap between renal disease and
diabetes or fat metabolism, it is unsupportable to believe that competition would not
occur.   By way of a rhetorical question, if Kemeta sells an acetone device to Mayo
Clinic's diabetes department and Invoy sells an acetone device to Mayo Clinic's
nephrology department, why would Dr. Vrtis think no competition will occur?  There is
a greater than 50% overlap between the patients, the treating physicians are likely to be
the same, and the distribution pathways are the same.   Clearly, there will be
competition.

152.    The License Agreement says nothing about diverse distribution channels
or any other terms that would give rise to market segmentation to minimize
competition.

153.    Caliber's position that Kemeta would not have enabled a competitor via
license is not supportable and does not make sense given the close overlap between
metabolic disorders like diabetes, renal disease, cancer, and others.

154.    Moreover, Invoy and Kemeta are both pre-revenue companies seeking to create products for an emerging, but not yet developed, market.  Given the early stages of the products, their potential, and their clinical acceptance, preventing overlapping markets is likely not even predictable with any level of certainty.

155.    As a sophisticated party, Dr. Vrtis assumed the risk of competition when she authorized a known competitor to license her company's intellectual property portfolio.

### 5)  The Parties Knew There Were Other Analytes for Fat Metabolism, Weight Management And Diabetes

156.    As to Dr. Vrtis' state of mind at the time of entering into the License Agreement, her own patent application (Invoy 074) enumerates multiple analytes that she herself claimed are useful for diabetes, fat metabolism or weight management.

157.    For example, Dr. Vrtis stated that $O_2$ and $CO_2$ are useful for metabolism. (Invoy 074).

158.    Dr. Vrtis identified "isoprene (cholesterol)" as a breath analyte.  It is well known that cholesterol measurement is a useful parameter to measure for diabetic and overweight patients. (Invoy 074).

### 6)  Conclusion

159.    In sum, the Court concludes that the scope of the License Agreement is the same under the contract's plain meaning as well as under the parol evidence of the facts

and circumstances surrounding its execution - Kemeta's retained scope of use is limited to devices and methods that comprise "breath acetone and no other breath analyte."[11]

## C.  THE SCOPE OF KEMETA TECHNOLOGY TO BE MADE AVAILABLE TO INVOY

160.    This leads to the final matter – what is Invoy entitled to under section 365(n) and how should it be made available to Invoy?

161.    The License Agreement has been rejected. As a result, under 11 U.S.C. §365(n)(1)(B), Invoy may elect to retain its rights under the License Agreement to such intellectual property as those rights existed immediately before the case commenced for the duration of such contract.

### 1)  Access to Kemeta Technology

162.    Under section 365(n), Invoy is entitled to full delivery, possession and use of the scope of Kemeta Technology as set forth in the License Agreement.  Invoy's and Kemeta's respective fields of use under the License Agreement are as literally set forth in Sections 1.7 and 1.8 of the Agreement.  Kemeta's Field of Use under Section 1.7, and under the Agreement, means the use of Kemeta's Intellectual Property for each of the purposes or treatment modalities set forth in subsections 1.7(a)-(f), e.g., "(a) for the detection and analysis of human breath acetone and no other breath analyte for weight

---

[11]   The Court for some time considered whether the parties had a "meeting of the minds" in the drafting and signing of the License Agreement.  *See Alexander v. O'Neil*, 267 P.2d 730, 734 (Ariz. 1954); *Hill-Shafer P'ship v. Chilson Family Trust*, 799 P.2d 810, 814 (Ariz. 1990).  However (and as set forth herein) based upon the plain meaning of the License Agreement and the parol of evidence surrounding its execution it is clear that the parties did, in fact, have a meeting of the minds.  That being said, **even if** the Court were to have found there was no such meeting the Court would have crafted the exact results set forth herein as a matter of equity.  *Associated Students of Univ. of Arizona v. Arizona Bd. of Regents*, 584 P.2d 564, 568 (Ariz. Ct. App. 1978) ("Once a contract is determined to be ambiguous, extrinsic evidence may be resorted to for the purpose of ascertaining its real meaning.").

management, weight reduction, fat metabolism, and fat loss management, and for the management, detection and monitoring of diabetes mellitus and for the care of persons with pre-diabetes mellitus or diabetes mellitus, …"  but with respect to each such subsection, only for detection and analysis of breath acetone and no other breath analyte.

163.    Kemeta's Field of Use under each subsection of Section 1.7 therefore shall be subject to two sets of limitations:  (1) that the analyte measured be acetone and no others, and (2) that the purpose or application for the measurement be within those specific applications expressly set forth in the respective subsections.  All other fields and uses of the Kemeta Intellectual Property are exclusive to Invoy.  Thus, as expressly set forth in Section 2.1 of the Agreement, "[n]othing herein shall preclude, and it is expressly understood by the Parties that Invoy has the right to any type of device, system, or method that measures and/or analyzes acetone, provided that it measures and/or analyzes one or more analytes in addition to acetone."

164.    Invoy is also entitled to reasonable access to the Licensed Technology and Licensed Processes.  This includes but is not limited to technology pertaining to Kemeta's breath analysis devices or methods for sensing acetone, whether alone or in addition to any other analyte. Moreover, Invoy is entitled to reasonable physical access to any and all embodiments of the Kemeta Intellectual Property, including but not limited to all prototypes and other embodiments of it, and shall have the right to inspect, analyze, test, copy, photocopy, photograph, or otherwise use such prototypes and embodiments, provided they are done non-destructively.

48

**2)  Payments Required By Invoy**

165.    If Invoy exercises its section 365(n) election under the License Agreement, however, then Invoy must "make all royalty payments due under such contract."  11 U.S.C. § 365(n)(2)(B).  Because Invoy will be "deemed to waive any right of setoff it may have with respect to such contract under [the Bankruptcy Code] or applicable nonbankruptcy law," 11 U.S.C. § 365(n)(2)(C)(i), Invoy must pay the full $130,000 license fee to the Trustee.   *See Encino Bus. Management v. Prize Frize, Inc. (In re Prize Frize)*, 32 F.3d 426, 428-29 (9th Cir. 1994).

166.    In *Prize Frize*, the debtor granted a licensee an exclusive license to use and sell a vending machine in exchange for a license fee.  *Id.* at 427.  When the debtor subsequently rejected the license in bankruptcy, the licensee elected to retain its rights under section 365(n)(1).  However, the licensee disputed that it "should be required to immediately pay $350,000 in past due license fee payments, contending that the obligation to make such payments was suspended because of [a] purported design defect."  *Id.* at 427-28.  The bankruptcy court disagreed and entered an order stating that the licensee must "make all license fee payments presently due in the amount of $350,000 within seven days of its election[.]"  *Id.* at 428.  The United States Court of Appeals for the Ninth Circuit affirmed, holding that "what the licensing agreement denominates 'license fees' must be regarded as 'royalty payments' for purposes of § 365(n)(1)(B)[.]"  *Id.* at 429.

167.    In addition, Invoy must make all other royalty payments required by section 365(n)(B)(1) (i.e., the 4% royalty) as well.  Invoy cannot avoid paying royalties

under section 365(n)(1)(B) by exercising recoupment.  In the Third Circuit recoupment is "narrowly construed."  *University Medical Center v. Sullivan (In re University Medical Center)*, 973 F.2d 1065, 1081 (3d Cir. 1992).  Specifically, recoupment is only permitted when "both debts . . . arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations." *Id.*

168.    Here, Invoy's obligation to pay royalties no longer arises from the License Agreement itself because that has been rejected.  Instead, Invoy's royalty obligations arise out of Section 365(n).   Because Invoy's claim for breach arises under the License Agreement, and its obligation to make royalty payments arises under Section 365(n), both debts do not arise out of a single integrated transaction and Invoy is not entitled to exercise recoupment.  Further, there is nothing inequitable about allowing the estate to enjoy the benefits of the royalties without performing its obligations because that is exactly what section 365(n) requires.

### 3)  Other Provisions Of Section 365(n)

169.    In addition, the remaining provisions of section 365(n) are applicable and the parties must comply with them. Invoy has requested the Court to make a number of findings and conclusions that are either not before the Court, nor supported by the evidence or superfluous. Section 365(n)'s provisions are anything but vague and this Court need not rule further than it has. If there are further disputes, however, the court will make itself available.

## <u>CONCLUSION</u>

170.    As set forth above at length, the Court finds in favor of Invoy.    The License Agreement was a binding executory contract and remains one today.    The terms and scope of the License Agreement and the Licensed Technology are those set forth in the Agreement.    Invoy is entitled to the rights of section 365(n) such as being provided with the use and reasonable access to the Licensed Technology and its burdens such as making payments due under the License Agreement to the Trustee.

171.    The parties shall submit under certification of counsel an order consistent with this Memorandum Opinion.